UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**GARLAND P. DOUGLAS**,                            Case No. 5:13 CV 1296

       Plaintiff,                             Magistrate Judge James R. Knepp II

    v.                                              MEMORANDUM  OPINION  AND

                                                ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

       Defendant.

### INTRODUCTION

Plaintiff Garland P. Douglas seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

On January 11, 2010, Plaintiff filed applications for DIB and SSI claiming he was disabled due to various back problems and anger management issues. (Tr. 163-68, 200). He alleged a disability onset date of December 31, 2004. (Tr. 163). His claims were denied initially and on reconsideration. (Tr.109-12). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 101). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 22, 39). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On June 12, 2013, Plaintiff filed the instant case. (Doc. 1).

FACTUAL BACKGROUND

Plaintiff challenges only the ALJ's treatment of Dr. Lewis' opinion with respect to his physical limitations and therefore waives any argument concerning his mental impairments. *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517-18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Therefore, the Court focuses on the medical evidence only as it relates to Plaintiff's physical impairments.

## Personal and Vocational History

Born February 10, 1966, Plaintiff was 38 years on his alleged onset date and 46 years old on the date of the ALJ's decision. (Tr. 31, 163). Plaintiff has a high school education, attended two years of college, and has past relevant work as a conveyor operator, maintenance mechanic, industrial electrician, diesel mechanic, marine electrician, and electrician. (Tr. 202, 276).

Plaintiff lived in a two-story house with a friend, Eileen. (Tr. 45-46). His fourteen-year-old son also lived with him during the summers and he took care of his ten-year-old daughter every weekend. (Tr. 45-46). Plaintiff went to Washington State two weeks after cervical surgery in 2011, but said he did not perform any work while there. (Tr. 46-47). Rather, he said he spent time in a recreation area where potential employees read books, watched movies, played games, and talked. (Tr. 46-49). When asked to confirm that he was paid $3,200 for a vacation, he replied, "That's right, yes sir, yes sir." (Tr. 49). Plaintiff also worked sporadically on a few occasions for a week at a time in 2010 and 2011. (Tr. 46-51).

Plaintiff testified that while he was not receiving treatment from 2007 until 2010, he drank beer or coffee, used old pain medication, and took Advil or Ibuprofren "like candy." (Tr.

57-64). When he did not have pain medication, Plaintiff said he would "grit his teeth and deal with it." (Tr. 57). Concerning daily activity, Plaintiff said he could not walk, sit, stand, or lie down. (Tr. 45-69). However, he said he could wash one dish at a time, work on the computer a few times a month, and make his pull-out bed every night. (Tr. 56, 66, 69). In function reports, Plaintiff said he could dress, bathe, shave, use the bathroom, prepare meals twice a week, shop occasionally for short periods, and read. (Tr. 255-57). Despite testifying he could not lie down, Plaintiff said when he was in "bad shape" he would lie in bed for two-to-four days, "sometimes a whole week!" (Tr. 255). Plaintiff also said he drove on occasion for short periods despite testifying he did not have a license. (Tr. 46, 256).

Plaintiff testified he was in a car accident in 2004. (Tr. 53). According to Plaintiff, he was sitting between the driver and the passenger seat in a car going 83 miles per hour when it struck four or five vehicles stopped at a stop-light. (Tr. 53-54). Plaintiff said "he was tossed into the air" and when he woke up he could not feel his legs and could not walk. (Tr. 54).

**Medical Evidence**

Indeed, Plaintiff was involved in a motor vehicle accident on February 22, 2004. (Tr. 905-06; 998-99). However, emergency room treatment notes revealed Plaintiff was unrestrained in the backseat, was not unconscious, and "got out of the van and walked around" after the accident. (Tr. 905). "His left leg was aching a little bit at that time" but it felt better on arrival to the hospital. (Tr. 905, 998). He reported neck tightness but no lower back pain, no abdominal discomfort, no chest pain, and no numbness or tingling in his extremities. (Tr. 905). On examination, Plaintiff was awake, alert, and oriented. (Tr. 905). Plaintiff's neck was supple without adenopathy but he did have "some paraspinal muscle spasms[,] questionable C-spine

tenderness around the C3-C4 region[,]" non-tender back, normal extremities, no motor or focal sensory deficits, and normal vascular and neurologic examinations of the extremities. (Tr. 905-06). Cervical spine x-rays were normal. (Tr. 528). Plaintiff was diagnosed with a "soft tissue injury", given "400 milligrams of Motrin with one Vicodin tablet", and discharged in good condition that same day. (Tr. 906). He was given a work excuse for one day. (Tr. 906).

Two days later, Plaintiff returned to the emergency room complaining of a headache and left arm pain. (Tr. 993). Plaintiff was given Darvocet and a work excuse for two days. (Tr. 994). In the months following his accident, Plaintiff participated in physical therapy. (Tr. 542-48).

In September 2004, Plaintiff underwent diagnostic left knee arthroscopy after reporting pain, locking, catching, giving way, and significant discomfort. (Tr. 285). Treatment notes revealed no abnormalities except a medial synovial shelf which the surgeon resected. (Tr. 285). There was no evidence of a meniscus tear. (Tr. 285). Dr. Coss recommended rest, ice, elevation, and progressive weight bearing. (Tr. 286). Plaintiff was also referred to a course of physical therapy. (Tr. 288-316). After a few sessions, Plaintiff reported he "felt good" and "ha[d] no pain to report." (Tr. 309). Plaintiff was discharged from treatment for failing to keep his last three appointments. (Tr. 608).

Plaintiff returned to the emergency room twice in November 2004 and reported chronic neck and back pain as a result of the car accident. (Tr. 451, 453, 455). During his November 18, 2004 visit, Plaintiff had full strength in his upper and lower extremities, normal sensation, and no weakness. (Tr. 455-56). He was given twenty Vicodin. (Tr. 451). Nine days later, he returned to the emergency room and stated he was out of Vicodin. (Tr. 451). Treatment notes revealed he was "very animated with his upper extremities" and "move[d] his head from side to side." (Tr.

451). Despite some tenderness, he had full and passive range of motion in his cervical spine. (Tr. 452). He was discharged with a diagnosis of acute exacerbation of upper back pain. (Tr. 452).

Plaintiff returned to the emergency room in December 2004 requesting a refill of Vicodin. (Tr. 458). Plaintiff was given a small amount but instructed that the emergency room staff would no longer provide pain medication refills. (Tr. 459). He was told to follow up with his primary care physician. (Tr. 459).

On January 19, 2005, Plaintiff began treatment with chiropractor Jason Cheatle, D.C. (Tr. 437). Dr. Cheatle treated Plaintiff throughout 2005 and during his workers compensation appeal. (Tr. 437-40, 896-99, 901-02, 907-10, 924-28, 932, 934, 940-46, 949, 1008, 1027-47). Generally, he noted Plaintiff's continued complaints of pain. (*Id*.). On initial examination, Plaintiff had a normal gait and ambulation but diminished cervical range of motion. (Tr. 436). Cervical spine MRI's requested by Dr. Cheatle revealed disc herniation at C3-4 and C5-6 with thecal sac compression, spondylosis at C6-7, annular tears at C2-5 levels, and mild neural canal narrowing at C6-7. (Tr. 930-31).

On January 30, 2005, Plaintiff went to the emergency room for left knee and neck pain. (Tr. 1017). An examination revealed full strength in his lower and upper extremities, excellent range of motion in his knee, and no abnormalities. (Tr. 1017). Despite some tenderness, his cervical range of motion was normal. (Tr. 1017-18). Treatment providers felt further diagnostic testing was unnecessary despite complaints of pain and prescribed Vicodin and Ibuprofen. (Tr. 1018).

On February 25, 2005, Plaintiff sought treatment with orthopedic surgeon Jeffrey M. Cochran, D.O., for complaints of neck and left arm pain. (Tr. 922). On examination, Plaintiff had

5

unrestricted cervical range of motion and no impingement signs in his shoulders or wrists. (Tr. 923). Dr. Cochran saw "no indication for surgical intervention" and recommended an exercise program. (Tr. 923).

That same day, Plaintiff went to the emergency room, asked to see a neurologist for chronic headaches, and requested pain medication. (Tr. 282-83). Plaintiff had no difficultly ambulating, good strength in his arms and legs, and no neck or back pain. (Tr. 282). Plaintiff indicated he only had a few Vicodin left but treatment providers informed him they could not prescribe pain medication for chronic conditions. (Tr. 283). At that point, Plaintiff "begged [hospital providers] for some Percocet. [They] told him no." (Tr. 283).

In April 2005, Plaintiff  sought treatment at a different emergency room. (Tr. 911-12). Plaintiff said he had been taking Vicodin, which provided relief, but he had run out. (Tr. 911). Plaintiff had some tightness in his neck but full strength and range of motion in his extremities. (Tr. 911). The attending physician prescribed twelve Vicodin and instructed Plaintiff to follow up with his treating physician. (Tr. 912).

Plaintiff saw Dr. Cochran in October 2005, who noted Plaintiff's MRI demonstrated multi-level spondylosis with varying degrees of disc bulging. (Tr. 1013). However, he noted "[t]here does not appear to be one area that I can account for his ongoing symptoms." (Tr. 1013). A physical examination revealed full upper extremity strength, a positive Tinel's sign at the left elbow and right wrist, and mildly positive Hoffman's sign on the right. (Tr. 1013). After reviewing his MRI, Dr. Cochran felt there were "very mild findings suggestive of myelopathy" and stated, "I do not feel [] I can offer him anything at this point." (Tr. 1013). Dr. Cochran noted Plaintiff's cervical spine could not be treated adequately from an anterior approach and neck pain

6

generally did not respond well to surgical intervention. (Tr. 1013-14). He recommended an EMG/nerve conduction study. (Tr. 1013).

On November 29, 2005, Plaintiff saw Mark J. Pelligrino, M.D., for an electrodiagnostic evaluation (nerve conduction study). (Tr. 1000-01). A physical examination revealed pain to palpation in the left cervical paraspinal and facet areas but normal left arm strength, normal sensation, and no atrophy. (Tr. 1000). Testing revealed diminished left ulnar sensory amplitude and slowed left ulnar motor studies but normal median and radial studies on the left. (Tr. 1000). Dr. Pelligrino's impression was mild left ulnar sensory entrapment and no significant root problems such as radiculopathy. (Tr. 1001).

Plaintiff returned to Dr. Cochran on January 9, 2006.  (Tr. 887). Dr. Cochran discussed Plaintiff's complaints of neck pain with radiation to the left shoulder and noted he was "using nothing for the pain." (Tr. 887). Dr. Cohran noted Plaintiff's physical examination was unchanged and said "[h]e had good strength". (Tr. 887). Dr. Cochran concluded he had "nothing further to offer" and did not feel Plaintiff was a candidate for anterior cervical surgery. (Tr. 887). As opposed to surgery, Dr. Cochran recommended Plaintiff consider cervical epidural injections, which Plaintiff underwent in May and June 2006 with 50 percent improvement in his left arm. (Tr. 855, 887).

Plaintiff received treatment at the Cleveland Clinic from August 2006 until September 2008. (Tr. 322-75). At his initial evaluation in August 2006, Michael Steinmetz, M.D., noted Plaintiff's complaints of left arm, back, and neck pain, with occasional right arm symptoms. (Tr. 571). On examination, Plaintiff exhibited pain to palpation in the spinal process but normal

muscle bulk and tone, full strength throughout, negative straight leg-raise testing, normal gait, and intact sensation. (Tr. 571-72).

Dr. Steinmetz recommended C5-6 and C6-7 cervical discectomy and fusion, which was performed in October 2006. (Tr. 331-32, 572). Post-operation, Plaintiff reported "a great deal of improvement in pain in the face/neck" but he "sometimes" had problems supporting his neck. (Tr. 323). He ambulated without distress and had full range of motion in his upper extremities. (Tr. 323). By November 2006, Dr. Steinmetz found Plaintiff was ready for vocational services. (Tr. 558).

In January 23, 2007, Dr. Cheatle referred Plaintiff to Michael Rivera, M.D., for occipital nerve blocks. (Tr. 536).  In February 2007, Plaintiff reported the nerve blocks helped "somewhat." (Tr. 848). Dr. Rivera recommended following up in two months and continuing treatment with Dr. Cheatle. (Tr. 848-49). Plaintiff followed up with Dr. Cheatle on January 24, 2007, and complained of continued upper back pain. (Tr. 532-33). Dr. Cheatle said he would focus on helping Plaintiff get Workers' Compensation benefits approved. (Tr. 532).

Plaintiff saw Paul Sheatzle, D.O., for pain management in July 2007. (Tr. 407). Plaintiff reported that his ability to hold his head up was slightly improved. (Tr. 407). An examination revealed slightly decreased cervical range of motion, slight guarding of the spinal muscles, intact arm muscle strength, normal gait, no difficulty transferring off the examination table, and no atrophy. (Tr. 407). Dr. Sheatzle refilled Plaintiff's medications and recommended vocational rehabilitation, daily walking, and strengthening exercises. (Tr. 407).

Plaintiff followed up with Dr. Steinmetz in September and October 2007. (Tr. 801, 1174). Physical examinations revealed full motor strength throughout, decreased sensation along C7-8,

8

and a normal gait. (Tr. 801, 1174). Dr. Steinmetz ordered a thoracic spine MRI, the results of which were normal. (Tr. 340, 801, 1174). Dr. Steinmetz prescribed Darvocet, stated he "ha[d] no surgical options to offer", and recommended facet injections and physical therapy. (Tr. 368, 801, 1175).

Also in October 2007, Plaintiff met with Jeffrey Biro, D.O., at the Cleveland Clinic for pain management. (Tr. 1176-78). A physical examination revealed limited cervical spine range of motion and pain to palpation, but no upper extremity weakness. (Tr. 1177). He recommended facet injections and medications such as Soma, Lyrica, or Cymbalta for "conservative care." (Tr. 1178).

Plaintiff returned to Dr. Steinmetz in December 2007 with new complaints of right arm pain. (Tr. 1172). Dr. Steinmetz reviewed two recent MRIs and an EMG and concluded there were no abnormalities. (Tr. 1172). Plaintiff returned in April 2008 and reported continued pain radiating into his fingers; however, his neck pain "ha[d] improved significantly [] (90% improvement noted)." (Tr. 363). Dr. Steinmetz referred Plaintiff to Anantha Reddy, M.D., a rehabilitation physician, for neck, shoulder, and arm strengthening. (Tr. 357-58, 363).

On April 7, 2008, Plaintiff saw Dr. Reddy for an initial evaluation. (Tr. 357-59). An examination was normal except for neck pain on movement. (Tr. 357-58). Dr. Reddy noted "increased pain behavior during physical exam." (Tr. 358). She reviewed a March 2008 CT scan which revealed uncomplicated anterior fusion of C5-7, a normal central canal, and soft tissue accentuation at the left piriform sinus. (Tr. 358-59, 1193-94). She recommended a Liboderm patch, strengthening exercises and stretches, and pool exercise. (Tr. 359).

In April 2008, Dr. Reddy referred Plaintiff to pain management specialist Alan Ng, M.D., for neck and arm pain. (Tr. 353). Plaintiff denied smoking but reported occasional alcohol use and cocaine use one or two months prior. (Tr. 354). He reported "fair" sleep habits – "4 hours of interrupted sleep per night" – and symptoms which interfered with his ability to take groceries out of the car. (Tr. 353). A physical examination revealed moderately limited cervical range of motion, cervical tenderness, mildy tender lumbar cervical paraspinals, and intact sensation. (Tr. 354). Dr. Ng found Plaintiff was "not an optimal candidate for procedural intervention". (Tr. 355).

Plaintiff participated in physical therapy from April 2008 through August 2008. (Tr. 377-87, 588). After several sessions, Plaintiff was not sure if physical therapy was helping but felt stronger in his shoulder and back. (Tr. 387). Plaintiff was discharged from treatment after failing to show for three appointments. (Tr. 588).

In June 2008, Plaintiff returned to Dr. Reddy for a follow up of "previous concerns of pain in the neck and intermittent arm pain". (Tr. 349). A physical examination revealed limited neck range of motion but non-antalgic gait, no swelling or redness in his limbs, normal heel and toe walk, no nerve root tension signs, and no muscle atrophy. (Tr. 350). Dr. Reddy noted Plaintiff's activity level was "regular" and he was "unrestricted with respect to [activities of daily living] and mobility." (Tr. 349). She recommended a chronic pain evaluation, physical therapy, and an increase of Neurontin. (Tr. 350).

On July 30, 2008, Kiva Shtull, M.D., examined Plaintiff for the Bureau of Workers' Compensation. (Tr. 751). On examination Dr. Shtull noted Plaintiff's "pain behaviors were extreme and inconsistent with his repeated complaint of left scapular pain" which "apparently

10

has been a recurrent theme". (Tr. 753). She further noted, "rather than guarding his left scapular area, he gesticulated and twisted and turned with no evidence of tenderness, spasms, trigger point injections, or any other abnormality in the area of the left shoulder blade which he complained of." (Tr. 753). Examination of the cervical spine  revealed no pain on palpation of the spinous process, paraspinal muscles, or paraspinal musculature despite "thorough and repeated palpation/massage/kneading of these areas."(Tr. 753). Examination of the thoracic spine revealed no pain on palpation to the same. (Tr. 753). Plaintiff had limited range of motion in his neck "although [he] did not appear to hold his neck stiffly at any time." (Tr. 753).

Dr. Shtull found Plaintiff had reached maximum medical improvement, noting "more than sufficient time ha[d] elapsed since the date of injury and since the date of his surger[ies]." (Tr. 754). She concluded Plaintiff could not return to his past work but he could perform work that restricted him from lifting, carrying, pulling, pushing, or manipulating any bulky objects or objects in excess of twenty pounds; no climbing ladders or scaffolds; no work above chest level; and no exposure to vibration. (Tr. 754). She felt there was no medical indication for vocational rehabilitation, additional medical treatment, or diagnostic tests except for the continued use of Neurontin, which Plaintiff indicated helped. (Tr. 755).

On September 22, 2008, Plaintiff saw Judith Scheman, Ph.D., for a pain medicine evaluation after referrals by Drs. Reddy and Steinmetz. (Tr. 344). Plaintiff complained of upper back and upper extremity pain since 2004. (Tr. 344). He said physical activity increased the pain but rest and alcohol decreased it. (Tr. 344). Plaintiff also claimed he was "housebound" and slept about "22 [h]ours a day." (Tr. 345). On examination, Plaintiff was pleasant but "somewhat grandiose." (Tr. 346). "Somatic preoccupation was extreme and pain behaviors included

11

excessive pain related conversation and squirming in his chair and rubbing his arms." (Tr. 346). Dr. Scheman recommended a chronic pain rehabilitation program and noted his prognosis was fair to good. (Tr. 346-47).

A week later, Plaintiff underwent EMG and nerve conduction studies of his left arm. (Tr. 482). The study was normal and showed no evidence of peripheral neuropathy or radiculopathy. (Tr. 482). An examination of his left upper extremity revealed no muscle atrophy, no decrease in muscle bulk, normal motor power, and intact sensation. (Tr. 482).

In February 2009, the Ohio Bureau of Vocational Rehabilitation (BVR) referred Plaintiff for a functional capacity evaluation (FCE). (Tr. 723-28). Physical therapist Roshini DiStefano found Plaintiff could perform work at the sedentary to light strength range but only if he was not required to sit for extended periods, was allowed to change positions as needed, did not have to bend, reach overhead, or lift repetitively, and did not have to lift more than negligible weight over waist level. (Tr. 723).

In May 2009, Plaintiff began a six-week work conditioning program. (Tr. 711). His therapist relayed that Plaintiff functioned in the light category, with slight improvement in the lifting category, and improvement in flexibility and strength. (Tr. 711). On June 29, 2009, Plaintiff was discharged from the work conditioning program "secondary to attendance issues." (Tr. 709). His therapist regretted Plaintiff was not able to complete the program as it appeared he was benefiting from it. (Tr. 709). He concluded Plaintiff could work in the light category with a limited tolerance for overhead reaching. (Tr. 709).

Plaintiff underwent a second FEC at the request of the Ohio BVR in July 2009. (Tr. 702). The evaluator concluded Plaintiff could work in the light to medium strength range, but with

only occasional lifting above shoulder level, no sustained overhead reaching, bending, kneeling, crouching, and crawling, and no continuous repetitive lifting. (Tr. 702).

On December 23, 2009, Plaintiff saw Greg Martin, Ph.D., for neuropsychological testing. (Tr. 625-30). Dr. Martin noted Plaintiff had been in work conditioning but did not complete it due to absences and failure to keep appointments. (Tr. 625). At that time, Plaintiff was participating in Job Search Skills Training. (Tr. 625, 692). Dr. Martin "was unable to get a reliable history about pain medication use." (Tr. 626). He also administered testing, but was not certain the results were valid and noted Plaintiff did not pass a validity measure. (Tr. 627). Dr. Martin felt Plaintiff required treatment for alcohol dependence, pain, depression, and a possible thought disorder. (Tr. 629). He recommended treatment for his alcohol dependence and chronic pain and noted Plaintiff's erratic attendance and pain medication abuse interfered with his treatment. (Tr. 629).

In February 2010, Plaintiff began treatment with pain management specialist Jamesetta Lewis, D.O., at Affinity Medical Center (Affinity). (Tr. 638). Plaintiff reported that between 2007 and 2010, he had been using "outdated prescription pain medications for pain control." (Tr. 639). Dr. Lewis was "unsure why" physicians had not prescribed pain medication over the last three years. (Tr. 639). Dr. Lewis also noted Plaintiff admitted to cocaine use. (Tr. 639). Plaintiff explained that "he was in so much pain that he was trying to find anything he could to try to reduce his overall pain." (Tr. 639). According to Plaintiff, he had not used cocaine since February 2008. (Tr. 639).

A physical examination revealed diminished cervical range of motion, a non-antalgic gait, unassisted ambulation, full motor strength in the upper extremities, tender points along the

upper trapezius muscles and rhomboids, no muscle atrophy, no edema, tenderness along the occipital nerve, diminished sensation along the left hand at the fourth and fifth digits, and limited cervical spine range of motion. (Tr. 641). Dr. Lewis diagnosed neck sprain and recommended an updated cervical spine CT scan, EMG/nerve conduction study, a TENS unit, Duragesic patches, Lyrica, and Trazodone for pain relief. (Tr. 642). The cervical spine CT scan revealed no acute skeletal pathology, intact anterior cervical fusion from C5-7, and multi-level degenerative changes including foraminal and central canal stenosis and disc bulge. (Tr. 650-51).

Plaintiff returned to Affinity in March 2010 complaining of neck pain, headaches, and uncontrollable twitching in his left arm and hand. (Tr. 652). Plaintiff said the Duragesic patches were not helpful, Lyrica helped, and he was "very happy" with his TENS unit. (Tr. 652). On examination, Plaintiff had tenderness in the cervical region, full strength, intact sensation, and negative straight leg raise testing. (Tr. 652). Dr. Lewis' physician's assistant recommended continuing use of the TENS unit "which ha[d] been very beneficial", a higher dose of Duragesic and Lyrica, and urine drug screening. (Tr. 653).

In April 2010, Dr. Cheatle answered a questionnaire for the state agency and noted Plaintiff had severe headaches, neck and upper back pain, and left arm/hand numbness. (Tr. 1093). He indicated Plaintiff had a normal gait and was able to perform fine and gross manipulation but for restricted periods of time. (Tr. 1093). He could also use his arms and legs for functional tasks except for pushing, pulling, or lifting above the waist. (Tr. 1093). In a December 2010 state agency questionnaire, Dr. Cheatle found Plaintiff could lift up to twenty pounds but was restricted from overhead work and pushing and pulling. (Tr. 1251).

State agency physician W. Jerry McCloud, M.D., assessed Plaintiff's physical residual functional capacity (RFC) on June 10, 2010. (Tr. 1140-47). Dr. McCloud concluded Plaintiff could perform light work that never required climbing ladders, ropes, or scaffolds and only occasionally required stooping, kneeling, crouching, and crawling (Tr. 1141-42). In December 2010, Esberdado Villanueva, M.D., affirmed Dr. McCloud's assessment as written. (Tr. 1331).

On June 15, 2010, Plaintiff returned to Dr. Steinmetz after a two year hiatus. (Tr. 1150-52). Dr. Steinmetz noted Plaintiff complained of the same type of posterior and anterior neck pain that he had prior to surgery. (Tr. 1150). Plaintiff requested new x-rays and a CT scan to see if there were any changes and would like to know if further surgery was warranted. (Tr. 1150). Dr. Steinmetz said he would call him after reviewing a scheduled CT scan. (Tr. 1150).

A few days later, Plaintiff returned to Affinity complaining of continued pain. (Tr. 1313-14). Plaintiff said he used his TENS unit on a daily basis, which helped, and tried to walk on a daily basis to keep up with his health. (Tr. 1313). He said his medication helped control his pain some but "not enough." (Tr. 1313). He indicated Workers' Compensation recently approved epidural steroid injections. (Tr. 1313). A physician's assistant adjusted his medications. (Tr. 1314).

In July 2010, Dr. Lewis performed a series of epidural steroid injections. (Tr. 1249-50, 1285-90). The first two injections provided moderate relief. (Tr. 1285, 1287).

An October 2010 cervical spine MRI revealed left C7-T1 disc protrusion cord compression and stenosis of the left lateral recess with additional degenerative changes. (Tr. 1324).

15

In May 2011, Plaintiff went to the emergency room and reported a headache, jaw pain, neck pain, and a right ear ache for the past five days. (Tr. 1338). Treatment notes revealed Plaintiff had a normal gait and could "perform all activities of daily living without assistance." (Tr. 1340).  Plaintiff further reported that he had TMJ (lock jaw) but he did not have any medications to take for it (Tr. 1340-41). During the physical examination, Plaintiff was tender over the bilateral TMJ regions, but his neck appeared normal. (Tr. 1342). He had normal musculoskeletal joint range of motion and no motor or sensory deficits. (Tr. 1342). The physician discharged Plaintiff with prescriptions for Prednisone and Vicodin. (Tr. 1343).

In September 2011, Plaintiff underwent a C7-T1 left laminaforaminotomy. (Tr. 1358). The day after the procedure, Plaintiff reported that his left arm numbness had not returned. (Tr. 1358).

Plaintiff presented to Lisa Vaughn, D.O., in November 2011 to establish care. (Tr. 1369). He indicated that he wanted a prescription for pain medication to carry him until his December 2011 appointment with pain management. (Tr. 1369). A physical examination was normal and Dr. Vaughn explained that she could not provide Plaintiff with ongoing prescriptions, but she did give him a short-term prescription for Vicodin to last until his December pain management appointment. (Tr. 1369-70).

Plaintiff returned to Dr. Lewis' office in December 2011 and reported 70 percent relief from his September neck surgery but said he continued to have pain. (Tr. 1365-67). Plaintiff's left arm numbness had decreased and he could sit for longer periods of time but he reported pain and pressure along his neck and an occasional burning sensation in his left arm. (Tr. 1365). Plaintiff was receiving Vicodin from his primary care physician and his surgeon, using three-to-

16

four tablets per day. (Tr. 1365). In addition, he had been over-utilizing Ibuprofen, taking up to ten-to-fifteen tablets per day. (Tr. 1365). Although Plaintiff was not working, he was participating in a vocational rehabilitation program. (Tr. 1366). He also said he was "considering applying for disability in the near future." (Tr. 1366). Plaintiff said epidural shots the prior year provided him with two-to-three months of pain relief. (Tr. 1366).

An examination revealed no difficulty rising from a seated to standing position, a non-antalgic gait, no difficulty ambulating, full muscle strength in the upper extremities, well-healed surgical scars, reduced cervical range of motion with tender points, and positive cervical facet loading. (Tr. 1366-67). Dr. Lewis diagnosed cervical post-laminectomy syndrome and chronic opioid dependence, and recommended, and thereafter administered, another series of cervical epidural steroid injections (Tr. 1367). She also prescribed Lyrica and continued use of Vicodin, Flexeril, and Trazodone (Tr. 1367).

In February 2012, Plaintiff followed up with Dr. Lewis and reported a significant increase in his pain over the last four weeks. (Tr. 1372). A physical examination revealed no difficulty rising from a seated to a standing position, a non-antalgic gait, unassisted ambulation, full motor strength, diminished cervical range of motion with tender points, and positive cervical facet loading. (Tr. 1373). Dr. Lewis felt Plaintiff would be an appropriate candidate for a vest TENS unit and also prescribed Vicodin and Lyrica. (Tr. 1373).

On March 15, 2012, Dr. Lewis completed a cervical spine RFC questionnaire. (Tr. 1377-79). Dr. Lewis found Plaintiff could rarely lift less than ten pounds; never lift ten pounds or more; sit for five minutes before needing to get up and for less than two hours total in an eight-hour workday; stand for 45 minutes before needing to change position and for less than two

17

hours total in an eight-hour workday; needed to walk around every fifteen minutes for five minutes at a time; needed a sit/stand option at will; would need to take three-to-four unscheduled breaks each day for ten to fifteen minutes each break; could never look down and rarely turn his head to the left, right, or up; rarely twist and never stoop, crouch, squat, or climb ladders or stairs; had significant reaching, handling, and fingering limitations; was incapable of even low-stress jobs; and would likely be absent more than four days per month (Tr. 1377-79). Dr. Lewis also completed a pain questionnaire which referred the reader to her previous evaluation. (Tr. 1380).

## ALJ Decision

On May 23, 2012, the ALJ found Plaintiff had various back and knee problems that constituted severe impairments but they did not meet a listed impairment, in combination or alone. (Tr. 27-28). The ALJ further found Plaintiff had the RFC to perform light work except he could never climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; and occasionally use the non-dominant left upper extremity for handling and reaching in all directions. (Tr. 28). Based on VE testimony, the ALJ concluded Plaintiff could perform work as a cleaner or housekeeper, usher, and storage facility rental clerk; thus, he was not disabled. (Tr. 32).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can he perform past relevant work?

5. Can the claimant do any other work considering his RFC, age, education, and work experience?

19

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if he satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff's sole issue on review is the ALJ's treatment of Dr. Lewis' RFC opinion. (Doc. 18, at 20-25). Specifically, Plaintiff claims the ALJ failed to 1) recognize Dr. Lewis as a treating physician; 2) assign weight to her opinion; and 3) provide good reasons for not affording the opinion controlling weight. (*Id.*). For the reasons discussed below, the Court finds the ALJ's treatment of Dr. Lewis' opinion legally sound and supported by substantial evidence.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by

20

"medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id.* at 409–410.

 "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

"If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment

21

relationship with them. § 416.902. This includes a consultative examiner. § 416.902.

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. § 416.902. This includes state agency physicians and psychologists. § 416.902. The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. § 416.927.

Plaintiff sought treatment with Dr. Lewis' office between 2010 and 2012. (Tr. 638-39, 652-53, 1313-14, 1249-50, 1285, 1287, 1366-67, 1372-73). In rejecting Dr. Lewis' opinion, the ALJ stated:

> As for the opinion evidence, the undersigned gives significant weight to the State agency medical consultants' opinions. The claimant is not fully credible regarding his symptoms and limitations. He testified he could not stand, sit, or lay down. The claimant said medication does not provide meaningful pain relief. He reported at one time using crutches and a cane, and using neck, shoulder, and knee braces. However, he overstates his functioning or lack thereof. The claimant went a few years with just outdated pain medication. He admitted taking the medication like candy. The claimant said in his Function Report that he could perform personal care slowly, make sandwiches, go outside once or twice a week, and drive. Treatment notes also show better pain response than the claimant suggests. Thus, Dr. Lewis's disability statement does not accurately reflect the claimant's functional abilities.

(Tr. 31).

Therefore, contrary to Plaintiff's argument, the ALJ did assign weight to Dr. Lewis' opinion by rejecting it. Moreover, the ALJ provided several good reasons using the required regulatory factors for not affording Dr. Lewis' opinion controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Namely, the ALJ addressed the supportability and the consistency of the opinion with the record as a whole by pointing to daily activity reports, inconsistent

testimony, and pain treatment to show Plaintiff was not as limited as Dr. Lewis claimed. *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (ALJ's reasoning may be brief so long as he touches upon the required regulatory factors).

Indeed, Dr. Lewis' opinion that Plaintiff had disabling physical limitations was inconsistent with and unsupported by her own treatment notes. Dr. Lewis' RFC opinion indicated Plaintiff had extreme limitations in sitting, standing, walking, lifting, using his arms, moving his neck, and engaging in postural movements. (Tr. 1377-79). However, while Dr. Lewis' physical examinations revealed diminished cervical range of motion and tenderness, nothing in the treatment notes reflect a back impairment or ambulation difficulty that would make sitting, standing, and walking difficult. (Tr. 641, 652). To the contrary, Dr. Lewis' physical examinations revealed a normal gait, unassisted ambulation, full motor strength in extremities, no muscle atrophy, and an ability to rise from a seated position. (Tr. 641, 652, 1365-67, 1373). Veritably, physical examination findings from other doctors reflect similar findings. (Tr. 282, 350, 354, 436, 451-52, 455-56, 571-72, 753, 905-06, 911, 923, 1000, 1017, 1174, 1177).

The ALJ's decision is further supported by state agency physicians and BVR consultants. Indeed, two BVR FCE's with respect to his Workers' Compensation claim revealed Plaintiff could perform work ranging from sedentary to light or light to medium (Tr. 702, 723) and two state agency physicians agreed that Plaintiff was capable of light work (Tr. 1141-42, 1331). BVR evaluators also found Plaintiff should not lift or reach more than occasionally over shoulder level, which the ALJ accounted for when he restricted Plaintiff to light work and only occasional use of his left arm in handling and reaching in all directions. (Tr. 28, 702, 723).

In addition, as the ALJ pointed out, Dr. Lewis' opinion was inconsistent with Plaintiff's reported daily activities. For example, Plaintiff was able to make a pull-out bed every night, worked on the computer, cared for himself, prepared meals, and shopped occasionally. (Tr. 56, 66, 69, 255-57). In addition, at least two treatment providers noted Plaintiff was unrestricted with respect to activities of daily living. (Tr. 349, 1340). Plaintiff's participation in physical therapy, vocational rehabilitation, his work-related trip to Washington, and sporadic work assignments also belie such severe restrictions. (Tr. 625, 692, 709, 711, 1366). Moreover, the ALJ was correct in noting that Plaintiff went without pain treatment for approximately three years of the relevant time period, electing to take out dated pain medication, drink coffee or alcohol, or "grit his teeth and deal with it." (Tr. 57-64, 639). And despite claims that nothing helped his pain, Dr. Lewis' treatment notes reflect epidural injections and a TENS unit relieved pain. (Tr. 652-53, 1285, 1287, 1313). This, coupled with habitual pain medication requests, and a penchant for "extreme and inconsistent" pain behaviors further support that Plaintiff was not nearly as limited as Dr. Lewis claimed. (Tr. 283, 345-46, 451, 459, 626, 753-54, 911-12).

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ applied and followed the correct legal standards and his decision is supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

> _____ s/James R. Knepp, II
> United States Magistrate Judge